**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **DAVID ALLEN BOLLING,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:12cv00035 |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, David Allen Bolling, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bolling protectively filed an application[2] for DIB[3] on September 16, 2008, alleging disability as of May 10, 2005, due to post traumatic stress disorder, varicose veins, memory problems, fatigue, back pain, knee pain, poor circulation, ringing in the ears, fatigue, anxiety and depression. (Record, ("R."), at 184-86, 200, 204, 237.) The claim was denied initially and on reconsideration. (R. at 104-06, 110-12, 115-18, 120-22.) Bolling then requested a hearing before an administrative law judge, ("ALJ"), (R. at 123-24.) The hearing was held on December 14, 2010, at which, Bolling was represented by counsel. (R. at 40-66.)

---

[2] Bolling also filed an application for Supplemental Security Income, ("SSI"), but this claim was denied because of income ineligibility. (R. at 98-101.)

[3] Bolling filed a prior claim for DIB on October 8, 1998. (R. at 200-01.) This claim was denied, and there is no evidence that Bolling appealed the denial. (R. at 200-01.)

By decision dated December 30, 2010, the ALJ denied Bolling's claim. (R. at 22-35.) The ALJ found that Bolling met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2006.[4] (R. at 24.) The ALJ also found that Bolling had not engaged in substantial gainful activity since May 10, 2005, the alleged onset date. (R. at 24.) The ALJ found that the medical evidence established that, through the date last insured, Bolling suffered from severe impairments, namely degenerative disc disease of the lumbar spine, substance abuse, major depressive disorder and post traumatic stress disorder, but he found that Bolling did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24, 28.) The ALJ also found that, through the date last insured, Bolling had the residual functional capacity to perform light work[5] that did not require him to work on uneven terrain, that required only rare operation of foot controls and kneeling, no more than occasional climbing and stooping and that did not require him to crouch or crawl. (R. at 29.) The ALJ also found that Bolling could perform tasks that involved short, simple instructions, he could occasionally interact with supervisors and co-workers, and he could handle brief public contact/interaction. (R. at 29.) Thus, the ALJ found that, through his date last insured, Bolling was unable to perform his past work. (R. at 33.) Based on Bolling's age, education, work history and residual functional capacity and the

---

[4] Therefore, Bolling must show that he became disabled between May 10, 2005, the alleged onset date, and March 31, 2006, the date last insured, in order to be entitled to DIB benefits.

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2013).

testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that he could perform, including jobs as a small products assembler, a cleaner/housekeeper and a garment folder. (R. at 34.) Thus, the ALJ found that Bolling was not under a disability as defined under the Act and was not eligible for benefits. (R. at 35.) *See* 20 C.F.R. § 404.1520(g) (2013).

After the ALJ issued his decision, Bolling pursued his administrative appeals, (R. at 17), but the Appeals Council denied his request for review. (R. at 1-4.) Bolling then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2013). The case is before this court on Bolling's motion for summary judgment filed April 25, 2013, and the Commissioner's motion for summary judgment filed May 28, 2013.

## II. Facts

Bolling was born in 1967, (R. at 44, 184), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Bolling obtained his general equivalency development, ("GED"), diploma and has past relevant work experience as a restaurant assistant manager, a glove turner, a logger, a lumber stacker and as a Reservist in the National Guard. (R. at 44, 205, 210.) Bolling testified at his hearing that he could stand and/or sit for up to two hours without interruption. (R. at 49.) He stated that although he experienced some pain relief with medication, he was constantly in pain. (R. at 53.) Bolling stated that he had been sober for three to four years. (R. at 55-56.)

Bolling reported that he could lift items weighing up to 10 pounds. (R. at 232.) He reported that he could walk up to 30 feet without interruption and that he would need to rest for up to 10 minutes after doing so. (R. at 232.) Bolling reported that his attention span was 10 minutes and that he had difficulty following written and oral instructions. (R. at 232.)

Vocational expert, James Williams, was present and testified at Bolling's hearing. (R. at 59-64.) Williams classified Bolling's work as a restaurant manager as light and skilled, his work as a logger was classified as heavy[6] and semi-skilled and his work as a lumber stacker as heavy and unskilled. (R. at 62.) Williams was asked to consider a hypothetical individual of Bolling's age, education and work history who could perform light work, who could not work on uneven terrain, who could rarely operate equipment controls, rarely kneel, never crouch or crawl, occasionally climb and stoop, who could perform only short, simple instructions, who was capable of occasionally interacting appropriately with supervisors and co-workers and who would have only brief interaction with the public. (R. at 62-63.) Williams stated that a significant number of jobs existed in the national economy that such an individual could perform, including jobs as a small products assembler, a cleaner/housekeeper and a garment folder. (R. at 63.) When asked to assume an individual with the same limitations as the previous hypothetical, but

---

[6] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. § 404.1567(d) (2013).

who would miss approximately two work days a month due to emotional problems, Williams stated that there would be no jobs available that such an individual could perform. (R. at 64.)

In rendering his decision, the ALJ reviewed medical records from Southwestern Virginia Mental Health Institute; Mountain Home Veterans Administration Medical Center; Dr. Kevin Blackwell, D.O.; Dr. Matthew W. Wood, Jr., M.D.; Norton Community Hospital; Function Better Therapy Services, Inc.; Lonesome Pine Hospital; Russell County Medical Center; Dr. Galileo Molina, M.D.; Wise County Behavioral Health Services; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Julie Jennings, Ph.D., a state agency psychologist; and Dr. Joseph Duckwall, M.D., a state agency physician. Bolling's attorney also submitted records from Lanthorn to the Appeals Council.[7]

Bolling was admitted to Southwestern Virginia Mental Health Institute in August 1998 following an overdose and superficially cutting his left wrist after he and his wife separated. (R. at 269-85.) He reported that he consumed two six-packs of beer three times a week and used his wife's Ativan and Ritalin one to two times a week to "feel better." (R. at 269.) He was diagnosed with recurrent, severe major depression, without psychotic features, partner relational problems, alcohol abuse, polysubstance dependence and post traumatic stress disorder, ("PTSD"). (R. at

---

[7] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-4), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

280.) Upon discharge, Bolling's Global Assessment of Functioning score, ("GAF"),[8] was assessed at 70.[9] (R. at 280.)

Bolling was treated at the Mountain Home Veterans Administration Medical Center, ("VA Hospital"), from February 1999 through October 2008 for lumbago, low back pain, PTSD, acute Hepatitis C, panic disorder without agoraphobia, obsessive compulsive disorder, joint pain, knee arthralgia, esophageal reflux, neuralgia, neuritis and radiculitis. (R. at 403-16, 689-739.) On April 17, 2003, Bolling was escorted to the VA Hospital in leg cuffs. (R. at 724-25.) Bolling reported that he was serving 11 months after consuming alcohol and breaking into someone's home. (R. at 724.) He was diagnosed with major depressive disorder and history of panic disorder. (R. at 725.) His then-current GAF score was assessed at 50.[10] (R. at 725.) On January 15, 2004, psychological testing showed an extremely severe level of depression and PTSD. (R. at 697-701.) Bolling was diagnosed with generalized anxiety disorder with intermittent panic attacks, alcohol dependence, PTSD, avoidant personality traits and social withdrawal and isolation. (R. at 700-01.) His then-current GAF score was assessed at 63. (R. at 701.)

---

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[9] A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

[10] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

In June 2004, Dr. Kevin Blackwell, D.O., saw Bolling for complaints of ankle pain after jumping out of a vehicle and twisting his ankle. (R. at 303.) He was diagnosed with second degree sprain to the right ankle. (R. at 303.) Dr. Blackwell opined that Bolling should avoid uneven terrain. (R. at 300.) Dr. Blackwell next saw Bolling in May 2005 for complaints of lower back pain. (R. at 297.) Examination revealed good mental status, some tenderness at the L2-L5 levels, negative straight leg raise testing, symmetrical and balanced gait and normal strength in his upper and lower extremities. (R. at 295, 297.) X-rays of Bolling's lumbar spine revealed mild degenerative changes. (R. at 309.) An MRI of Bolling's lumbar spine showed osteophytes and herniated nucleus pulposus at the distal thoracic spine with encroachment of the conus medullaris and exiting spinal nerve on the right side with nonspecific hypertrophic and degenerative changes at the lumbar spine. (R. at 307-08.) Dr. Blackwell diagnosed left sciatica and determined that Bolling could return to light duty work. (R. at 295.) On June 2, 2005, Bolling described his back pain as "5/10." (R. at 293.) Examination revealed good mental status, some tenderness in the right lower back, but no spasm, negative straight leg raise testing, symmetrical and balanced gait and normal strength in his upper and lower extremities. (R. at 293.) Bolling was diagnosed with right lower leg pain, low back pain and history of left sciatica. (R. at 293.)

On May 10, 2005, Bolling presented to the emergency room at Norton Community Hospital for complaints of back pain after lifting a stack of lumber. (R. at 421-23.) X-rays of Bolling's lumbar spine showed mild degenerative changes. (R. at 422.) Bolling was diagnosed with acute myofascial lumbar strain

and acute chronic lower back pain. (R. at 423.)

The record shows that Dr. Galileo Molina, M.D., treated Bolling from May 20, 2005, through March 16, 2006, for acute low back syndrome, chronic tendinitis in both knees, respiratory allergies, anxiety, depressive disorder, chronic dyspepsia and rheumatoid arthritis. (R. at 363-73.) On June 30, 2005, an MRI of Bolling's left knee showed prepatellar tendinitis. (R. at 371, 383.) Dr. Molina diagnosed low back syndrome with radiculopathy and chronic tendinitis suprapatellar in both knees. (R. at 371.)

On June 13, 2005, Dr. Matthew W. Wood, Jr., M.D., examined Bolling upon referral from Dr. Blackwell. (R. at 338.) Examination revealed a "pleasant, muscular appropriate gentleman" with some decreased range of motion, but otherwise normal findings. (R. at 338.) Dr. Wood noted Bolling's MRI results and recommended that Bolling walk as much as possible. (R. at 338.) A June 2005 CT scan of the lumbar spine revealed mild to moderate right disc bulge/protrusion at the L1-L2 levels, degenerative facet changes at the L2-L3 levels and left lateral disc bulge near the left L4 nerve root consistent with neural impingement. (R. at 315-17, 336-37.) However, Dr. Wood commented that he did not agree with the radiologist's report of "left lateral disc bulge that appears to about the left L4 nerve root" because the density was unusual and not significantly protruding. (R. at 333.) Dr. Wood recommended an epidural injection and physical therapy for stretching and range of motion, but did not recommend surgery. (R. at 333.) A June 2005 EMG suggested right L5 radiculopathy, but no peripheral polyneuropathy or

plexopathy. (R. at 332, 436.)

On July 25, 2005, Bolling reported that he had made little progress with physical therapy. (R. at 321.) He had normal lumbar range of motion and station. (R. at 321.) Dr. Wood insisted that Bolling stop smoking immediately, complete his injections, increase his activities and exercise at physical therapy. (R. at 321.) Bolling underwent an epidural injection on August 2, 2005. (R. at 326.) On August 11, 2005, Bolling reported that the injection made him worse. (R. at 324.) He admitted that the numbness in his left foot had improved. (R. at 324.) Examination revealed tenderness without signs of inflammation or swelling. (R. at 324.) On August 29, 2005, Dr. Wood reported that Bolling had reached maximum medical improvement and could return to work with appropriate restrictions. (R. at 480.) He reported that Bolling could not lift items weighing more than 50 pounds. (R. at 564.)

On August 24, 2005, a functional capacity evaluation was performed at Function Better Therapy Services, Inc. (R. at 445-71.) The evaluation showed that Bolling could occasionally lift items weighing up to 50 pounds from his waist-to-shoulder, 40 pounds from floor-to-waist, 45 pounds from floor-to-shoulder and 25 pounds from shoulder-to-overhead. (R. at 446.) Bolling could frequently lift items weighing up to 35 pounds from the waist-to-shoulder and floor-to-waist levels. (R. at 446.) He could carry items weighing up to 40 pounds for a distance of 50 feet. (R. at 446.) Bolling could negotiate steps and ladders. (R. at 446.) He could kneel, crouch, squat and sit in the floor. (R. at 446.) It was noted that Bolling was

consistently slow to rise from low position and displayed slowed work rates with sustained low-level work. (R. at 446.) Overall, Bolling demonstrated the physical capacity to perform medium[11] strength work. (R. at 446.) Overall, test findings suggested "some minor inconsistency" to the reliability and/or accuracy of Bolling's subjective reports of pain and limitations. (R. at 445.)

On January 29, 2007, Bolling was evaluated by Dr. Randall E. Pitone, M.D., a psychiatrist, and Amalia Collins, L.C.S.W., a licensed clinical social worker, for mood swings, depression and irritability. (R. at 388-90.) Bolling reported a history of alcohol abuse, but stated that he had not consumed alcoholic beverages since November 2006. (R. at 388.) He reported that he would get upset, angry and irritated if things were out of place or if something was not done in the proper sequence. (R. at 389.) Dr. Pitone reported that Bolling's mood was moderately depressed and mildly anxious. (R. at 389.) His affect was appropriate to mood and conversation with good range. (R. at 389.) His thought associations were intact, and his thinking was organized and goal-directed with normal rate and flow. (R. at 389.) Bolling's wife reported that Bolling had experienced flashbacks from his military work. (R. at 387.) She reported that Bolling once grabbed her by the neck and held a pocket watch to her neck and said, to no one that was present, "if you come any closer, I'll kill her." (R. at 387.) She reported that on a different occasion, Bolling grabbed her and told her to "be quiet and to look at the lights," stating that the house was completely dark at the time. (R. at 387.) Bolling's wife

---

[11] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2013).

also reported that Bolling cut himself on the forehead and stated, "they know what I know and we've got to go, I've talked to my captain." (R. at 387.) Dr. Pitone diagnosed recurrent, moderate major depressive disorder, history of PTSD and history of alcohol dependence, then in early remission. (R. at 390.) Dr. Pitone assessed Bolling's then-current GAF score at 40-45.[12] (R. at 390.) Bolling was scheduled to see Collins on February 20, 2007, but did not keep this appointment because he had no transportation. (R. at 386.) When contacted, Bolling reported that he was doing "ok." (R. at 386.) There is no indication in the file that Bolling received further treatment from Dr. Pitone or Collins.

Records from Frontier Health indicate that on February 9, 2007, a temporary detention order was issued after Bolling's wife reported that Bolling wanted her to get him a gun so that he could kill himself. (R. at 394-98.) Bolling's mood was depressed, and his affect was flat. (R. at 396.) He was found to be mentally ill and/or abusing substances, to be an imminent danger to himself or others, to be unable to care for himself, to be incapable of consenting to voluntary treatment and to be unwilling to be treated voluntarily. (R. at 397.) Bolling was diagnosed with PTSD, recurrent major depressive disorder and alcohol abuse. (R. at 397.) On June 8, 2007, Bolling was diagnosed with PTSD, recurrent, severe major depressive disorder and episodic alcohol abuse. (R. at 392.) His then-current GAF score was assessed at 52, with his highest GAF score being 52 and his lowest GAF score being 45 within the past six months. (R. at 392.)

---

[12] A GAF score of 31-40 indicates that the individual has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood ...." DSM-IV at 32.

On May 14, 2009, Julie Jennings, Ph.D., a state agency psychologist, reported that Bolling suffered from and affective disorder and an anxiety-related disorder. (R. at 85-87.) Jennings opined that Bolling was mildly restricted in his activities of daily living and that he experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 86.) No repeated episodes of decompensation were reported. (R. at 86.)

That same day, Dr. Joseph Duckwall, M.D., a state agency physician, found that Bolling could occasionally lift and carry items weighing up to 50 pounds and frequently lift and carry items weighing up to 25 pounds. (R. at 87-90.) Dr. Duckwall opined that Bolling could stand, walk and/or sit for up to six hours in an eight-hour workday, and his ability to push and/or pull was unlimited. (R. at 88.) He opined that Bolling could occasionally climb ramps and stairs and never climb ladders, ropes or scaffolds. (R. at 88.) His ability to balance, kneel, crouch and crawl was unlimited. (R. at 89.) Dr. Duckwall opined that Bolling could occasionally stoop and that he should avoid concentrated exposure to machinery and heights. (R. at 89-90.)

On November 16, 2010, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Bolling at the request of Bolling's attorney. (R. at 741-51.) Lanthorn reported that Bolling's affect was generally flat, and he was somewhat on edge, and he described his mood as an "agitated depression." (R. at 746.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Bolling obtained a full-scale IQ score of 74. (R. at 747.)

Lanthorn diagnosed chronic PTSD; recurrent, severe major depressive disorder; chronic pain disorder associated with both psychological factors and general medical conditions; alcohol dependence in full remission; and borderline intellectual functioning. (R. at 750.) Lanthorn assessed Bolling's then-current GAF score at 50. (R. at 751.) Lanthorn reported that Bolling's psychopathology was "quite serious and limiting in his day to day functioning causing marked overall limitations in his capacity to perform in a work-related function…." (R. at 751.)

Lanthorn completed a mental assessment indicating that Bolling had an unlimited ability to understand, remember and carry out simple job instructions. (R. at 752-54.) He opined that Bolling had a limited, but satisfactory, ability to maintain personal appearance and a seriously limited, but not precluded, ability to follow work rules, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out complex and detailed job instructions and to behave in an emotionally stable manner. (R. at 752-53.) Lanthorn opined that Bolling had no useful ability to relate to co-workers, to deal with the public, to deal with work stresses, to relate predictably in social situations and to demonstrate reliability. (R. at 752-53.) He reported that Bolling's impairments would cause him to be absent from work more than two days a month. (R. at 754.)

By letter dated March 10, 2011, Lanthorn indicated that, based on his evaluation, personal interview and testing, as well as a comprehensive review of treatment records dating back to the late 1990s, it was his "opinion to a reasonable

degree of medical probability that on or prior to March 31, 2006, Mr. Bolling was suffering severe depression and severe chronic post traumatic stress disorder and that my evaluation and mental assessment dated [November 16, 2010,] accurately reflect what I believe to be his condition on or prior to March 31, 2006." (R. at 267, 757.) Lanthorn indicated that Bolling would meet the listing for severe depression found at § 12.04A(1) and for severe chronic PTSD found at § 12.06A(5). (R. at 267, 757.) Lanthorn also indicated that Bolling met these listings on or prior to March 31, 2006. (R. at 267, 757.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2013).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by

substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Bolling argues that the ALJ erred by failing to give full consideration to the findings of Lanthorn. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-7.) Bolling also argues that the ALJ erred by failing to have a medical expert present at the hearing to testify as to the severity of his impairments. (Plaintiff's Brief at 7-8.)

The ALJ found that the medical evidence established that, through the date last insured, Bolling suffered from severe impairments, namely degenerative disc disease of the lumbar spine, substance abuse, major depressive disorder and PTSD, but he found that Bolling did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24, 28.) The ALJ also found that, through the date last insured, Bolling had the residual functional capacity to perform light work that did not require him to work on uneven terrain, that required only rare operation of foot controls and kneeling, no more than occasional climbing and stooping and that did not require him to crouch or crawl. (R. at 29.) The ALJ also found that Bolling could perform tasks that involved short, simple instructions, he could occasionally interact with supervisors and co-workers, and he could handle brief public contact/interaction. (R. at 29.) Based on my review of the record, I find that substantial evidence exists in the record to support this finding. I also find that

substantial evidence exists to support the ALJ's weighing of the medical evidence.

The period relevant to this disability claim is May 10, 2005, Bolling's alleged date of disability, through March 31, 2006, Bolling's date last insured. Bolling argues that the ALJ erred by failing to give full consideration to the findings of Lanthorn. (Plaintiff's Brief at 6-7.) The record shows that Lanthorn evaluated Bolling in November 2010, four and a half years after Bolling's date last insured. (R. at 741-51.) The ALJ noted that while Lanthorn's findings "may be an accurate reflection of the claimant's current condition, they have no probative value for determining the claimant's mental status at or prior to March 31, 2006, …." (R. at 28.) Bolling later filed a letter from Lanthorn with the Appeals Council wherein Lanthorn stated that his November 2010 evaluation accurately reflected what he believed to be Bolling's condition on or prior to March 31, 2006. (R. at 267, 757.) The Appeals Council found that this evidence pertained to a "later time;" therefore, it would not affect the ALJ's decision. (R. at 2.)

While the record shows that Bolling suffered from major depression and PTSD since 1998, no limitations on his work-related abilities were noted. (R. at 269-85, 689-739.) The record also notes that these diagnoses were associated with Bolling's alcohol and polysubstance dependence. (R. at 280, 700-01.) Once hospitalized and detoxified, Bolling's depression improved, and he no longer had depression or suicidal thoughts. (R. at 280.) In 2004, Bolling's GAF score was assessed at 63, indicating some mild symptoms or mild difficulty in social, occupational or school functioning. (R. at 701.) In May 2005, Bolling's mental status was noted as "good." (R. at 293, 295.) In February 2007, Bolling threatened suicide. (R. at 396.) In addition to being diagnosed with PTSD and major

depressive disorder, Bolling was diagnosed with alcohol abuse. (R. at 397.) Again, in June 2007, Bolling was diagnosed with alcohol abuse. (R. at 392.) If alcoholism or drug addiction is a contributing factor material to the determination of disability, a claimant may not be considered disabled. *See* 42 U.S.C.A. § 423(d)(2)(C), 1382c(a)(3)(J) (West 2011, West 2012); *Mitchell v. CSS,* 182 F.3d 272, 274 n.2 (4th Cir. 1999). Alcoholism or substance abuse is "material" if the claimant would not be disabled if he stopped abusing alcohol or drugs. *See* 20 C.F.R. § 404.1535(b) (2013).

The ALJ found that Bolling was limited to performing tasks that involved short, simple instructions and only occasional interaction with supervisors and co-workers. (R. at 29.) The ALJ based these findings on Bolling's testimony, his extensive activities of daily living and conservative treatment. (R. at 30-31, 33.) Based on my review of the record, I find that substantial evidence exists to support the ALJ's finding with regard to Bolling's mental residual functional capacity between the time period of May 10, 2005, and March 31, 2006.

Bolling also argues that the ALJ erred by failing to have a medical expert present at the hearing to testify as to the severity of his impairments. (Plaintiff's Brief at 7-8.) According to the regulations, an ALJ may ask for and consider opinions from medical experts on the nature and severity of a claimant's impairments and on whether such impairments equal the requirements of any listed impairment. *See* 20 C.F.R. § 404.1527(e)(2)(iii) (2013). Thus, the regulations permit an ALJ to obtain a medical expert, but do not mandate it. Bolling argues that the ALJ should have obtained medical expert testimony based on the ALJ's statement that Bolling established that he had lumbar spine degenerative disc

disease and radiculopathy to the right lower extremity, but noted that "there were conflicting opinions as to whether actual nerve root impingement was shown." (Plaintiff's Brief at 8.) The ALJ did state this in his opinion. (R. at 33.) However, the ALJ analyzed all the relevant evidence, concluding that Bolling had the residual functional capacity to perform a limited range of light work. It is clear from the ALJ's thorough decision and the evidence of record now before the court that there was adequate evidence on which to base a decision, thereby rendering medical expert testimony unnecessary.

Dr. Blackwell noted in May 2005 that Bolling could return to light duty work. (R. at 295.) Dr. Wood noted in August 2005, that Bolling had reached maximum medical improvement and could return to work that did not require him to lift items weighing in excess of 50 pounds. (R. at 564.) In addition, a functional capacity evaluation performed in August 2005 showed that Bolling had the residual functional capacity for medium work. (R. at 445-71.)

It is for all of these reasons, that I find that substantial evidence supports the ALJ's failure to obtain expert medical testimony regarding the nature and severity of Bolling's physical impairments. Therefore, I find that substantial evidence supports the ALJ's finding that Bolling is not disabled and not entitled to DIB benefits for the time period of May 10, 2005, through March 31, 2006.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the Commissioner's weighing of the medical evidence;

2. Substantial evidence exists to support the Commissioner's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Bolling was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Bolling's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2013):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      August 26, 2013.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE